FILED
2017 Mar-14  PM 04:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| STACY ALLEN SPARKS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  5:14-cv-00013-MHH-JHE |
| | ) | |
| SHERIFF RODNEY INGLE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Plaintiff Stacey Allen Sparks filed a *pro se* complaint and two amended complaints. Mr. Sparks seeks monetary damages or injunctive relief pursuant to 42 U.S.C. § 1983 for violations of his civil rights.  (Docs. 1, 8, 10 & 13).  Mr. Sparks contends that jail administrators and correctional officers at the Fayette County Jail violated his Eighth Amendment and due process rights by denying him medical attention and anti-seizure medication.  (Doc. 1 at 3-4).  Mr. Sparks suffers from epilepsy, asthma, and food allergies.  (Doc. 1 at 3; Doc. 34-1 at 8-19).  Mr. Sparks also contends that the food served at the Fayette County Jail is not adequate to meet daily nutritional requirements or to accommodate his food allergies and that the Fayette County Jail is poorly ventilated.  (Doc. 1 at 3).  Mr. Sparks's claims are before the Court on the defendants' motions for summary judgment.[1]

---

[1] Consistent with the procedures from § 1983 actions, the defendants filed a special report.  (Doc. 31).  The Court has construed the defendants' special report as a motion for summary judgment.  (Doc. 32).

# I. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). When considering a summary judgment motion, the Court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015).

Any "specific facts" pled in a *pro se* plaintiff's sworn complaint must be considered in opposition to summary judgment. *See Caldwell v. Warden, FCI Talladega,* 748 F.3d 1090, 1098 (11th Cir. 2014) (citing *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986)). Additionally, because the plaintiff is *pro se*, the Court must construe the complaint more liberally than it would pleadings drafted

by lawyers. *Hughes v. Rowe*, 449 U.S. 5, 9 (1980); *Boxer X v. Harris*, 437 F.3d 1107, 1110 (11th Cir. 2006) ("*Pro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed.").

## II. Summary Judgment Facts

On January 16, 2013, Mr. Sparks was booked into the Fayette County Jail ("FCJ") facility for misdemeanor probation violations. (Doc. 31-4 at 23) (displaying eight convictions for negotiating a worthless negotiable instrument, Case Numbers DC-2011-260 through 261; DC-2011-621 to 622). A jail booking card bearing the same date states that on the day he entered the jail, Mr. Sparks was six feet, one inch tall and weighed 170 pounds. (*Id.*). The booking card displays a "medical alert" concerning a seizure that Mr. Sparks experienced in 2011. (Doc. 39 at 2, 11; Doc. 31-4 at 21, 23).

Between January 17, 2013, and January 19, 2013, jail staff administered an anti-seizure medicine to Mr. Sparks twice each day. (Doc. 31-4 at 2).[2] The record indicates that the plaintiff was "out" of this medication from January 20, 2013 until January 29, 2013. (*Id.*). Between January 29, 2013, and March 29, 2013, jail staff again gave Mr. Sparks anti-seizure medication as ordered. (*Id.* at 2-7). On March 30, 2013, the plaintiff again ran "out" of Levetiracetam. (*Id*. at 7). Mr. Sparks

---

[2] Mr. Sparks took Levetiracetam, an anticonvulsant used for "[a]djunctive therapy in the treatment of myoclonic," "partial-onset," and "primary generalized tonic-clonic" seizures in adults. *See* www.merckmedicalmanuals.com.

asserts that he "made several requests verbally to Officers about receiving his medication and never received a proper response." (Doc. 39 at 3).

Mr. Sparks asked then Jail Administrator (currently Chief Jailer) Chris Whitley "to see the Doctor or inquire about his seizure medicine," but "[e]very time" Whitley would give him "the run around," stating that "(1) [a]ll the deputies [were] busy and could not take him to the doctor, (2) the sheriff has not approved it yet, or (3) the Fayette County Commission could not afford it." (Doc. 1 at 7; doc. 32-2 at 1). The plaintiff attests Whitley "did not pass" his "complaints on to" Sheriff Ingle, as required by FCJ employee policy. (Doc. 39 at 2-3; doc. 40-2 at 2).

Mr. Whitley admits he "or the Chief Jailor make medical appointments for inmates," but he does "not recall" Mr. Sparks complaining about "seizures[,] needing anti-seizure medication[,]" or requesting "to see a doctor or receive medical attention." (Doc. 31-2 at 5-6). Mr. Whitley denies making the statements the plaintiff attributes to him, and describes the plaintiff as an impatient, "constant complainer" about mostly "minor and knit-picky" matters. (*Id.* at 2).

Without his medication, Mr. Sparks suffered two seizures that "[e]ndangered himself of dying or injuring himself badly." (Doc. 1 at 7; doc. 39 at 2, 6). Bobby Smith, Jr., was an inmate at the FCJ from April 7, 2012, until June 20, 2015. (Doc. 39 at 7). Smith declares as follows:

> I was housed in one of three one man cells across from the Plaintiff's cell block. I could see the jailer when he opened the door, to where

4

the Plaintiff was housed.  A couple of times I heard banging on the walls and door.  I asked Chris Whitley what was going on.  He told me Stacy Sparks was having another seizure.  T[h]is happened at least 2 times.

(*Id.* at 8).

Sheriff Ingle told the plaintiff "he was working on" getting the medicine, but this was "months after" Mr. Sparks had been deprived of the prescription.  (Doc. 1 at 8).  Sheriff Ingle declares he usually visits the FCJ "several times a week and stay[s] apprised of the happenings in the facility through communication with jail staff; however," the sheriff recalls "no meaningful interaction with the Plaintiff during his incarceration."   (Doc. 40-2 at 1-2).  Sheriff Ingle denies Mr. Sparks told him, "any jail staff member, inmate or any other person that [he] had a seizure" in the FCJ, and asserts the plaintiff never complained to him "regarding seizures[,] needing anti-seizure medication[,]" or request "to see a doctor or receive medical attention."  (*Id.* at 5).  Mr. Sparks contends that Sheriff "Ingle has been charged and has settled complaints by the ACLU concerning the welfare and conditions of the" FCJ. (Doc. 39 at 1). Moreover, Sheriff Ingle's office is "only steps away from the jail population," and "[b]eing in his office does not constitute a visit to the jail." (*Id.*).  Bobby Smith, Jr. declares he saw Sheriff Ingle in the jail maybe "10 times" while he was incarcerated, and Sheriff Ingle "would go weeks without being seen by inmates.  The only time" Sheriff Ingle "was seen was during a shakedown or disturbance."  (*Id.* at 8).

On May 15, 2013,  Dr. Magouirk examined Mr. Sparks.  (Doc. 31-4 at 22).  Mr. Sparks's chief complaint was prescription renewal; he had "no complaints" regarding his symptoms, area of involvement, condition, degree of intensity or severity, duration, onset or timing, and no need for modification in treatment as he was "doing well, without acute complaints."  (*Id.*).

Dr. Magouirk noted that Mr. Sparks was "well-nourished [194 pounds], well-developed, and in no acute distress."  (*Id.*).   The plaintiff was "awake, conversant, [and in] good spirits."  (*Id.*).   Dr. Magouirk assessed the plaintiff as having "convulsions or seizures" and "asthma."  (*Id.*).  Dr. Magouirk prescribed Phenytoin, Keppra, Albuterol, and Azmacort.  (*Id.*).[3]  Dr. Magouirk instructed Mr. Sparks to return if problems developed or worsened.  (*Id.*).  From May 15, 2013, to August 16, 2013, Mr. Sparks received the medication that Dr. Magouirk prescribed.  (Doc. 34-1 at 8-19).

In addition to his seizure disorder and asthma, Mr. Sparks is allergic to peanut butter and onions.  (Doc. 39 at 3).  The jail served peanut butter sandwiches "when they did not have hot meals, and the hot meals ha[d] onions that could cause asthma attacks."  (Doc. 1 at 8).   Mr. Sparks reports that he:

---

[3] Phenytoin is used for "[c]ontrol of generalized tonic-clonic and complex partial (psychomotor, temporal lobe) seizures[,]" and Keppra is the brand name for Levetiracetam. www.merckmedicalmanuals.com.

was often given 4 pieces of bread and 2 pieces of cheese when onions were served in a meal from the local Chinese restaurant which was done as much as 4 times a week.[4] In addition, the Plaintiff was given only sandwich bread at lunch when the population got 2 peanut butter sandwiches.[5]

That is clearly less than 2000 calories a day.

(*Id.* at 3).

Eric Dubielak, a Fayette County deputy sheriff since May 2010 and jail administrator since July 2013, provided sample FCJ daily menus for a one week period in 2014 and a two week period in 2015. (Doc. 31-6 at 2-4; doc. 40-1 at 1). Mr. Dubielak and Sheriff Ingle declare these menus are "the same" as those in place during the plaintiff's incarceration. (Doc. 40-1 at 8; doc. 40-2 at 6). The jail administrators are responsible for preparing the menus, which "are planned to meet or exceed a 2000 calorie a day diet[,]" and "meet or exceed nutrition standards by the American Dietetic Association." (Doc. 40-1 at 8; Doc. 40-2 at 6-7.). Mr. Dubielak and defendants Ingle and Whitley attest, and the sample menus reflect, that:

---

[4] Bobby Smith, Jr. confirms meals from the Chinese restaurant contained a lot of onions, states he saw the plaintiff being given cheese sandwiches instead of Chinese food, and asserts the jailer told him this was because the plaintiff could not eat onions. (Doc. 39 at 12).

[5] In an affidavit, Mr. Sparks attests he "was given a *cheese* sandwich when general population was given two peanut butter sandwiches, which doesn't comply with nutritional daily allowance one should have of 2000 calories." (Doc. 39 at 12). Moreover, Bobby Smith Jr., declares he "often saw cheese sandwiches on the tray with the peanut butter sandwiches. [Smith] would ask the jailer who those sandwiches were for. He would say Stacy Sparks. The reason [Smith] asked was because [he] wanted an extra sandwich." (Doc. 39 at 8).

Lunch and Dinner meals are normally one starch, two vegetables, one meat, one bread, and a dessert or snack item.  Breakfast is normally grits or oatmeal with a serving of eggs or peanut butter and a snack.

.  .  .  Meals are prepared in the facility kitchen by jail trustees supervised by Corrections Officers.  Under no circumstances may any meals be modified for disciplinary purposes or as a reward for good inmate behavior.  A member of the Jail staff will observe the service of food in order to ensure that the portions of food on each tray are equal.

Occasionally, an inmate's family, a church or community group requests to bring a meal to the jail.  The meal must be approved by the Chief Jailer, Jail Administrator or Sheriff to confirm that the meal will meet jail standards.

 (Doc. 31-2 at 6-7; doc. 31-6 at 2-4; doc. 40-1 at 8; doc. 40-2 at 6-7).

Peanut butter and Chinese food are often listed on the menus.  (Doc. 31-6 at 2-4).  However, where either item is listed, additional items are also listed.  (*Id.*).  For instance, grits or oatmeal, and peanut butter and a snack are breakfast menu items.  (*Id.*).  If peanut butter or Chinese food is listed for lunch or dinner, additional items such as corn, tat[e]rs, peas or beans, and a snack or bread are also listed.  (*Id.*).  The plaintiff and Bobby Smith, Jr. attest the sample menus did not exist while they were in the FCJ and assert they were given bologna or peanut butter for breakfast and lunch.  (Doc. 39 at 3, 7, 11).  Mr. Sparks states he suffered from malnutrition that caused severe weight loss.  (Doc. 39 at 4).

Mr. Sparks contends that Prison Commissioner Dunn was responsible for the conditions at the FCJ when Mr. Sparks "became a ward of the state" (*id.* at 3) on May 7, 2013, when he pled guilty to Second Degree Theft and received a twenty-year sentence, split to serve four years (doc. 31-4 at 20).  Mr. Sparks declares the "State of Alabama should have known the conditions of the" FCJ. (Doc. 39 at 4).  But, Mr. Dunn did not become Commissioner of the Alabama Department of Corrections ("ADOC") until April 1, 2015, and he was not employed at the ADOC before his appointment as Commissioner.  (Doc. 27-1 at 1).

### III. Analysis

### A.    Failure to Exhaust Administrative Remedies

As an initial matter, defendants Ingle and Whitley argue that Mr. Sparks's claims are barred for failure to exhaust the administrative remedies.  (Doc. 31 at 10-13).  Title 42 U.S.C. §1997e(a), as amended by the PLRA, provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted.

*Id.*  "[E]xhaustion is a" mandatory "precondition to suit."  *Alexander v. Hawk*, 159 F.3d 1321, 1325-26 (11th Cir. 1998) (discussing 42 U.S.C. § 1997e(a)'s exhaustion mandate).  A prisoner must exhaust the administrative remedies available to him regardless of whether those remedies meet certain "minimum acceptable

standards" of fairness and effectiveness or provide the relief the prisoner seeks. *Booth v. Churner*, 532 U.S. 731, 740 n. 5, 741 (2001). Courts cannot waive or excuse exhaustion even when it would be "appropriate and in the interests of justice." *Id.*

Evaluating whether claims should be dismissed for failure to exhaust administrative remedies is a two-step process.[6]  *Turner v. Burnside*, 541 F.3d at 1082 (citing *Lawrence v. Dunbar*, 919 F.2d 1525, 1528, 1529 (11th Cir. 1990) (comparing the decision to the "'two forms' of attacks ― facial and factual ― on subject matter jurisdiction")).

> First, district courts look to the factual allegations in the motion to dismiss and those in the prisoner's response and accept the prisoner's view of the facts as true.  The court should dismiss if the facts as stated by the prisoner show a failure to exhaust.   Second, if dismissal is not warranted on the prisoner's view of the facts, the court makes specific findings to resolve disputes of fact, and should dismiss if, based on those findings, defendants have shown a failure to exhaust. [*Turner*, 541] at 1082-83; *see also id.* at 1082 (explaining that defendants bear the burden of showing a failure to exhaust).

*Whatley v. Warden, Ware State Prison*, 802 F.3d 1205, 1209 (11th Cir. 2015).

Defendant Whitley attests that "[a]t booking, Plaintiff was given the Fayette County Jail Handbook containing the jail rules and regulations."  (Doc. 31-2 at 2).

---

[6] The defense of failure to exhaust administrative remedies should be raised in a motion to dismiss, or be treated as such if raised in a motion for summary judgment.  *Bryant v. Rich*, 530 F.3d 1368, 1375 (11th Cir. 2008).

Mr. Whitley also declares, and defendant Ingle agrees, that:

> [t]he Fayette County Sheriff's Office has a grievance policy for inmates to express complaints with the conditions of their confinement.  This policy requires that members of the Fayette County Jail staff receive and answer any written grievances made by inmates to the Sheriff, Jail Administrator or any Corrections Officer. Inmates in the Jail are furnished Inmate Request Forms for the purpose of stating their requests or grievances in writing.  When an inmate has a grievance, he or she may request a form from any member of jail staff, complete it, and return it to any member of jail staff.  Grievances are forwarded to the Jail Administrator for review and appropriate action.  If an inmate is dissatisfied with the response he or she receives, he or she may appeal to the Sheriff Ingle, who will make the final decision.

(Doc. 31-2 at 3; Doc. 40-2 at 2-3).

Defendant Whitley does "not recall ever receiving an Inmate Request Form from the [p]laintiff regarding the allegations in his complaint or any other matter. Any Inmate Request Forms filed by" the plaintiff "would be in his Inmate File." (Doc. 31-2 at 3).  Whitley attests the plaintiff did not make "a complaint or grievance" to him "regarding the allegations" in the complaint, nor is he aware of the plaintiff having done so "to any other employee . . . or to the Sheriff himself." (*Id.*).  Defendant Ingle asserts he "received no Inmate Request Form, grievance, or an appeal from" Mr. Sparks, and defendants Whitley and Ingle argue that Mr. Sparks failed to follow the grievance procedure.  (Doc. 31-2 at 4; Doc. 40-2 at 3).

Attached to defendants Whitley and Ingle's motion for summary judgment is the "Fayette County Jail Inmate Handbook Rule and Regulations 2014."  (Doc. 31-

5).   The only portion of the handbook pertinent to the issues at hand is titled, "Inmate Request Forms," and it reads, "Inmate request forms are used for medical, grievance, and other communication with Jail Administrator, Chief Jailer or Secretary.   Forms will be filled out legible and complete."   (*Id.* at 3).   Jail Administrator Dubielak attests inmate request forms are placed in an inmate's file. (Doc. 40-1 at 3).   The defendants have not produced request forms from Mr. Sparks.

Mr. Sparks contends that "during his incarceration there was NEVER any type of handbook given out nor was there ANY type of Grievance Forms o[r] process at the Fayette County Jail.  The defendant has showed a handbook that just came into existence but no grievance forms or request[s] because neither EXIST." (Doc. 39 at 2).   Bobby Smith, Jr., agrees and adds that he received an inmate handbook for the first time in the fall of 2014.   (*Id.* at 7-8).   Defendant Whitley declares the plaintiff received a copy of the Inmate Handbook (doc. 31-2 at 7), but Mr. Whitley does not assert that he has personal knowledge of this fact.   None of the defendants attests that a handbook identical to the 2014 handbook existed in 2013.   Defendants Whitley and Ingle describe a grievance process that includes an inmate's opportunity to appeal an unsatisfactory decision to defendant Ingle, but the 2014 handbook describes no such procedure.   These discrepancies give rise to a factual dispute regarding the grievance procedure available at the FCJ.   Therefore,

defendants Whitley and Ingle have not demonstrated a failure to exhaust as a matter of law.

**B.      Prison Commissioner Jefferson S. Dunn**

      **1.      Eleventh Amendment Immunity**

A "suit against the State [of Alabama] and its [agencies for monetary damages is] barred by the Eleventh Amendment, unless Alabama has consented to the filing of such a suit." *Alabama v. Pugh,* 438 U.S. 781, 782 (1978) (citing *Edelman v. Jordan*, 415 U.S. 651 (1974); *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459 (1945); and *Worcester County Trust Co. v. Riley*, 302 U.S. 292 (1937)).  No such consent can "be given under Art. I, Sec. 14, of the Alabama Constitution, which provides that "the State of Alabama shall never be made a defendant in any court of law or equity." *Id.*; *see also*, *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-100 (1984).  Further, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is not different from a suit against the state itself." *Will v. Michigan Dept. State Police*, 491 U.S. 58, 71 (1989) (citation omitted).

Because defendant Dunn is an employee of the Alabama Department of Corrections, which is an agency of the State of Alabama, to the extent he is named

as a defendant in his official capacity, Eleventh Amendment immunity prohibits the plaintiff's suit for monetary damages against Commissioner Dunn.[7]

### 2.      Individual Capacity

Mr. Dunn was not appointed Prison Commissioner for the Alabama Department of Corrections until April 1, 2015 (doc. 27-1 at 1), approximately eighteen months after Mr. Sparks was released from the Fayette County Jail. Before his appointment, Mr. Dunn had not been an employee of the Alabama Department of Corrections.  (*Id.*).  Therefore, Mr. Dunn could not have been responsible for Mr. Sparks's alleged injuries.  As a result, Mr. Sparks's claim against Commissioner Dunn fails as a matter of law.

### C.      Deliberate Indifference to Serious Medical Needs

On January 16, 2013, the plaintiff was booked into the Fayette County Jail for misdemeanor probation violations.  (Doc. 31-4 at 23) (eight convictions for negotiating a worthless negotiable instrument, Case Numbers DC-2011-260 through 261; DC-2011-621 to 622). On February 6, 2013, a Fayette County District Judge revoked the plaintiff's probation on all eight cases, ordered him to serve twelve months in the county jail, and directed his sentence to begin January

---

[7] Because Mr. Sparks no longer is an inmate of the Fayette County Jail, there is no basis for injunctive relief.

16, 2013.  *See State of Alabama v. Stacy Sparks*, DC-3022-000621.00, doc. 7).[8]
Thus, at all times relevant to the allegations in the plaintiff's complaint, he was a
convicted prisoner.

An officer or prison official's "'deliberate indifference to [the] serious
medical needs of [a] prisoner[ ] constitutes the unnecessary and wanton infliction
of pain . . . proscribed by the Eighth Amendment.'" *Farrow v. West*, 320 F.3d
1235, 1243 (11th Cir. 2003).  The Eleventh Circuit has explained:

> Deliberate indifference to a detainee's serious medical needs requires
> 1) an objectively serious medical need and 2) a defendant who acted
> with deliberate indifference to that need.  A "serious medical need" is
> "one that is diagnosed by a physician as requiring treatment or one
> that is so obvious that a lay person would recognize the need for
> medical treatment."  For liability, the defendant must 1) have
> subjective knowledge of a risk of serious harm, 2) disregard that risk,
> and 3) display conduct beyond gross negligence.
>
> Deliberate indifference may result not only from failure to provide
> medical care at all, but also from excessive delay: "Even where
> medical care is ultimately provided, a prison official may nonetheless
> act with deliberate indifference by delaying the treatment of serious
> medical needs."

*Pourmoghani-Esfahani   v.   Gee*, 625   F.3d   1313,   1317 (11th   Cir.   2010)
(internal citations omitted).

---

[8] This Court "may take judicial notice" of "state court proceedings."  *Coney v. Smith*, 738 F.2d
1199, 1200 (11th Cir. 1984) (citing *Moore v. Estelle*, 526 F.2d 690, 694 (5th Cir. 1976)).  *See
also*, Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to
reasonable dispute because it . . . can be accurately and readily determined from sources whose
accuracy cannot reasonably be questioned.").

### 1.     Objectively Serious Medical Need

Mr. Sparks suffers from a seizure disorder, and a medical alert concerning the disorder was present in his jail file. (Doc. 31-4 at 23). With the exception of a brief period in January 2013, the plaintiff was given his daily seizure medication at the FCJ until it ran "out" on March 30, 2013. (*Id.* at 2, 7).   The plaintiff was administered no medication whatsoever until May 15, 2013.   (*Id.* at 8).   The plaintiff's "unmedicated epileptic condition while at the jail posed a serious threat to his health" and satisfies the first prong of his Eighth Amendment claim, which is the presence of a "serious medical need."   *Hudson v. McHugh*, 148 F.3d 859, 863 (7th Cir. 1998).

### 2.     Deliberate Indifference

#### a.     Former Jail Administrator Chris Whitley

With regard to the second prong, and construing the disputed facts in the light most favorable to the plaintiff, between March 30, 2013, and May 15, 2013, Mr. Sparks repeatedly asked then Jail Administrator Chris Whitley "to see the Doctor or inquire about his seizure medicine," but "[e]very time" Whitley would give Mr. Sparks "the run around," stating that "(1) [a]ll the deputies [were] busy and could not take him to the doctor, (2) the sheriff has not approved it yet, or (3) the Fayette County Commission could not afford it."  (Doc. 1 at 7; Doc. 32-2 at 1).

Mr. Whitley "did not pass the plaintiff's complaints on to" the sheriff, as FCJ employee policy requires.  (Doc. 39 at 2-3; Doc. 40-2 at 2).

Mr. Sparks had two seizures because he was not given his medication, and Mr. Whitley was well aware of the seizures because he twice told inmate Bobby Smith, Jr. that the loud banging Mr. Smith heard was the sound of Mr. Sparks having a seizure.  (Doc. 39 at 8).  Mr. Whitley admits either he "or the Chief Jailor" was responsible for making medical appointments for inmates" at that time. (Doc. 31-2 at 5-6).  Mr. Sparks's medication was not renewed until he was taken for an appointment with Dr. Magouirk on May 15, 2013.  (Doc. 31-4 at 22). Although the plaintiff reported no complaints to Dr. Magouirk, the doctor renewed the anti-seizure medication Mr. Sparks had been taking and added a new anti-seizure medication to the plaintiff's daily regimen.  (*Id.*).  Mr. Sparks received both medications until he was transferred to state prison on August 16, 2013.  (*Id.* at 8-19).

Mr. Sparks has produced sufficient evidence to create a genuine dispute as to whether Mr. Whitley had subjective knowledge of a risk of serious harm to Mr. Sparks but intentionally disregarded that risk by delaying the renewal of Mr. Sparks's anti-seizure prescriptions.  Mr. Whitley argues the plaintiff's civil action cannot be brought because the plaintiff suffered no physical injury from the seizures.  (Doc. 31 at 13) (citing 42 U.S.C.A. § 1997e(e)).  Title 42 U.S.C. §

1997e(e) provides that a plaintiff may not recover monetary damages (compensatory or punitive) for mental or emotional injury unless he also alleges he suffered more than a *de minimus* physical injury. *Quinlan v. Personal Transport Servs., Inc.*, 329 Fed. Appx. 246, 248 (11th Cir. 2009) (citing *Smith v. Allen*, 502 F.3d 1255, 1271 (11th Cir. 2007)). Although § 1997e(e) does not define physical injury, the Eleventh Circuit has explained "the physical injury must be more than *de minimus*, but need not be significant." *Id.* (quoting *Harris v. Garner*, 190 F.3d 1279, 1286 (11th Cir. 1999), *vacated in part on other grounds*, 216 F.3d 970 (11th Cir. 2000) (en banc)). Notably, however, "[n]ominal damages are appropriate if a plaintiff establishes a violation of a fundamental constitutional right, even if he cannot prove actual injury sufficient to entitle him to compensatory damages." *Hughes v. Lott*, 350 F.3d 1157, 1162 (11th Cir. 2003).

Here, Mr. Sparks does not contend he suffered any pain or physical injuries as a result of the two seizures he experienced when not receiving his medication. The only evidence as to the severity of these seizures is an affidavit from another inmate stating he and Mr. Whitley could hear the plaintiff's "body banging on the walls and door." (Doc. 39 at 8). Furthermore, on May 15, 2013, when he saw Dr. Magourik, Mr. Sparks had "no complaints" regarding his symptoms, area of involvement, condition, degree of intensity or severity, duration, onset or timing, and no need for modification in treatment as he was "doing well, without acute

complaints." (Doc. 31-4 at 22). Any physical injury Mr. Sparks suffered as a result of these two seizures was, at most, *de minimus*.

In his complaint, Mr. Sparks requests, "[a]ny additional relief this court deems just proper, and equitable." (Doc. 1 at 10). This can be liberally construed as requesting nominal damages. Accordingly, the plaintiff's Eighth Amendment deliberate indifference claim against Mr. Whitley will go forward because nominal damages may be available. *See Brooks v. Warden*, 800 F.3d 1295, 1308 (11th Cir. 2015) (inmate may seek nominal damages for constitutional injury, absent physical injury, consistent with the text and purpose of the PLRA).

Mr. Whitley also argues that he is entitled to qualified immunity. (Doc. 31 at 15-19). To establish qualified immunity, a public official must prove "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred[,]" and then the burden shifts to the plaintiff to show the defendant lacked good faith, which is done by demonstrating the defendant public official's actions "violated clearly established constitutional law." C*ourson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991) (quoting *Rich v. Dollar*, 841 F.2d 1558, 1563-64 (11th Cir. 1988)). The standard for determining whether a right is well-established for purposes of qualified immunity is whether the right violated is one about "which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is not available because delaying

medical treatment and withholding medication are well-established bases for constitutional violations.  *See Johnson v. Hay*, 931 F.2d 456, 461 (8th Cir. 1991) (denying qualified immunity to former prison pharmacist who intentionally refused to fill an inmate's anti-seizure medication); *Estelle v. Gamble,* 429 U.S. 97, 104–05 (1976) (the Eighth Amendment prohibits the "unnecessary and wanton infliction of pain . . . . whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.") (internal quotation marks and citation omitted).  Therefore, genuine issues of material fact preclude summary judgment for Mr. Whitley in his individual capacity.

### b.  Sheriff Rodney Ingle

Construing the facts in a light most favorable to the plaintiff, Mr. Whitley failed to notify Sheriff Rodney Ingle about the plaintiff's need for anti-seizure medication, although employee policy required Mr. Whitley to do so.  (Doc. 39 at 2-3; doc. 40-2 at 2).   Months after he had been deprived of his medication, Mr. Sparks asked Sheriff Ingle for assistance, and Ingle responded that he was working on getting the medication.  (Doc. 1 at 8).  On May 15, 2013, Dr. Magouirk examined Mr. Sparks and prescribed the necessary medication.  (Doc. 31-4 at 22).

The foregoing facts do not create a genuine dispute regarding whether

Sheriff Ingle was subjectively aware that Mr. Sparks was not receiving his medication and had suffered two seizures, but nevertheless intentionally delayed the plaintiff's ability to renew his medication. Rather, Mr. Sparks's facts suggest that a short time after he spoke directly to Sheriff Ingle, he saw the doctor who renewed his medication, and Mr. Sparks received the medication until his transfer to a state penitentiary.

Mr. Sparks also appears to be attempting to establish liability against Sheriff Ingle based upon Sheriff Ingle's supervisory status. Mr. Sparks declares "[Sheriff] Ingle has been charged and has settled complaints by the ACLU concerning the welfare and conditions of the" FCJ. (Doc. 39 at 1). Moreover, Sheriff Ingle's office is "only steps away from the jail population," and "[b]eing in his office does not constitute a visit to the jail." (*Id.*).

Because "[t]here is no *respondeat superior* liability under § 1983," *Harris v. Ostrout*, 65 F.3d 912, 917 (11th Cir. 1995) (citing *Monell v. Dept. of Social Services*, 436 U.S. 658, 690-92 (1978); and *LaMarca v. Turner*, 995 F.2d 1526, 1538 (11th Cir. 1993)), "[t]he standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous." *Braddy v. Florida Dept. of Labor and Employment Security*, 133 F.3d 797, 802 (11th Cir. 1998). "Supervisory personnel may be held accountable for the constitutional violations of their subordinates only upon proof that" the supervisor (1) was

"directly involved in the wrongdoing; (2) failed to remedy a wrong after learning of it through report or appeal; (3) created or allowed a policy under which the violation occurred; or (4) [was] grossly negligent in managing subordinates who caused the wrongdoing."  *Johnson v. Butler*, 2015 WL 8295346, *2 (N.D. Ala. 2015) (citing *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir. 1986)).

Sheriff Ingle's failure to visit the jail often and Mr. Sparks's vague, unsupported declaration that Sheriff Ingle has settled complaints by the ACLU concerning the welfare of inmates and conditions at the jail fail to create a genuine issue of material fact regarding the liability of the sheriff in his supervisory capacity in this particular case.  The Court grants Sheriff Ingle's motion for summary judgment as to Mr. Sparks's Eighth Amendment medical care claim.

**D.    Condition of Confinement**

To establish an Eighth Amendment condition of confinement claim, a plaintiff must prove three elements: (1) a condition of confinement that inflicted unnecessary pain or suffering (i.e., was cruel and unusual), (2) the defendants' "deliberate indifference" to that condition, and (3) causation.  *LaMarca v. Turner*, 995 F.2d 1526, 1535 (11th Cir. 1993) (internal citations omitted).  Whether a particular condition of confinement constituted cruel and unusual punishment is an objective inquiry and whether prison officials were deliberately indifferent to that

condition is a subjective inquiry.  *Id.* at 1535 n. 17 (citing *Hudson v. McMillian*, 503 U.S. 1 (1992)).

Prison conditions amount to cruel and unusual punishment only when they result in "unquestioned and serious deprivation of basic human needs." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  While it is the duty of prison officials to furnish prisoners with "reasonably adequate" food, clothing, shelter, and sanitation, *Newman v. Alabama*, 559 F.2d 283, 286 (5th Cir. 1977), *rev'd in part on other grounds*, 438 U.S. 781 (1978), the Constitution "does not mandate comfortable prisons," *Rhodes v. Chapman*, 452 U.S. 337, 349 (1982).  "[T]he Constitution does not require that prisoners be provided any and every amenity which some person may think is needed to avoid mental, physical, and emotional deterioration." *Newman*, 559 F.2d at 291.  "Conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional.  To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes*, 452 U.S. at 347.

"To be deliberately indifferent, a prison official must knowingly or recklessly disregard an inmate's basic needs." *LaMarca*, 995 F.2d at 1535.  To establish that an official was deliberately indifferent, "a plaintiff must prove that the official possessed knowledge both of the infirm condition and of the means to cure that condition, 'so that a conscious, culpable refusal to prevent the harm can

be inferred from the defendant's failure to prevent it.'" *Id.* at 1535 (quoting *Duckworth v. Franzen*, 780 F.2d 645, 653 (7th Cir. 1985), *cert. denied*, 479 U.S. 816 (1986)).

It is undisputed that the plaintiff suffers from onion and peanut allergies. (Doc. 39 at 3).  However, it also is undisputed that the plaintiff was given cheese sandwiches when Chinese food containing onions or peanut butter sandwiches were served to general population inmates.  (*Id.*).

Moreover, Mr. Sparks has presented no evidence that indicates that he became malnourished and lost weight because of the food provided at FCJ. Rather, Mr. Sparks gained weight.  According to his January 16, 2013 jail booking card, he weighed 170 pounds.  (Doc. 31-4 at 3).  Five months later, on May 15, 2013, Dr. Magouirk recorded the plaintiff's weight at 194 pounds.  (*Id.* at 22).  Dr. Magouirk observed that Mr. Sparks was "well-nourished, well-developed, and in no acute distress."  (*Id.*).  Mr. Sparks was "conversant, [in] good spirits," and had no complaints other than desiring that his medication be renewed.  (*Id.*).  Mr. Sparks has produced no evidence to establish that he lost weight or that he suffered an allergic reaction between May 15, 2013 and August 16, 2013, the day he was transferred to a state correctional facility.  (Doc. 40-1 at 2).

Thus, despite Mr. Sparks's and Mr. Smith's contentions that bologna or peanut butter was served for breakfast and lunch and Mr. Sparks's contradictory

statement concerning the cheese sandwiches he received in place of Chinese food or peanut butter, the evidence indicates that the FCJ provided "'well-balanced meal[s], containing sufficient nutritional value to preserve health, [which] is all that is'" necessary to satisfy the Constitution's requirement "that prisoners be provided 'reasonably adequate food.'"  *Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1575 (11th Cir. 1985) (quoting *Smith v. Sullivan,* 553 F.2d 373, 380 (5th Cir. 1977); *Jones v. Diamond,* 636 F.2d 1364, 1378 (5th Cir. 1981)).[9]  The plaintiff has produced no evidence to show that the substituted cheese sandwiches in any way caused or triggered the two seizures he had while at the facility.

Moreover, the plaintiff does not allege he complained to defendants Whitley or Ingle about the quality or quantity of the food items available to him—from a nutritional or medical standpoint.  Nor did he make any complaints to Dr. Magouirk.  As such, there is no evidence defendants Whitley or Ingle were subjectively aware that any constitutional deprivation was occurring in relation to the food offered to the plaintiff, but were deliberately indifferent to the purported deprivation.

Because Mr. Sparks has not presented evidence to establish either a constitutional deprivation or deliberate indifference in connection with his Eighth

---

[9] Under *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), this court is bound by cases decided by the former Fifth Circuit before October 1, 1981.

Amendment condition of confinement claims, the Court will enter summary judgment on those claims.

## IV. Conclusion

For the reasons stated above, the motion for summary judgment is **GRANTED** as to all claims against Commissioner Dunn; the plaintiff's Eighth Amendment deliberate indifference to medical care claim against Sheriff Ingle; and the plaintiff's Eighth Amendment condition of confinement claims against defendants Whitley and Ingle.

The motion for summary judgment is **DENIED** as to Mr. Sparks's Eighth Amendment deliberate indifference to medical care claim against Mr. Whitley.  By separate order, the Court will order the parties to mediate this claim.

**DONE** and **ORDERED** this March 14, 2017.

_Madeline H. Haikala_

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE